**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-3113-WJM-STV

ESTATE OF KYLER GRABBINGBEAR by Andrea Feltman, as Personal
Representative, and
ANDREA FELTMAN, individually as Parent and Personal Representative,

      Plaintiffs,

v.

WILFRED EUROPE, individually and in his official capacity as Deputy Sheriff for Adams
County,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT EUROPE'S MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendant Wilfred Europe's, individually and in his official capacity as Deputy Sheriff for Adams County, Motion for Summary Judgment ("Motion").  (ECF No. 84.)  Europe filed a Supplement to the Motion.  (ECF No. 85.)  Plaintiffs Estate of Kyler Grabbingbear, by Andrea Feltman, as Personal Representative, and Andrea Feltman, individually as Parent and Personal Representative (jointly, "Plaintiffs") filed an amended response in opposition.  (ECF No. 107.)  Europe filed a reply.  (ECF No. 91.)

For the following reasons, the Motion is granted in part and denied in part.

**I. STANDARD OF REVIEW**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## II. BACKGROUND

### A.     Material Facts[1]

On December 7, 2017, Europe was a Deputy Sheriff with the Adams County Sheriff's Office.  (ECF No. 84 at 3 ¶ 1.)  In the early morning hours of December 7, 2017, Europe went to the apartment building at 8770 Galen Court, specifically apartment 303, to notify the victim of a crime that an individual involved in the crime was being released from jail.  (ECF No. 84 at 3 ¶ 2.)  While Europe was speaking with the resident of apartment 303, he heard male and female voices yelling next door in apartment 301.  (ECF No. 84 at 3 ¶ 4.)  Europe heard sounds that led him to believe there might be a physical altercation happening in apartment 301.  (ECF No. 84 at 4 ¶ 7.)  At that point, suspecting the possibility of domestic violence, Europe called dispatch on his radio to advise of the situation and request backup.  (ECF No. 84 at 4 ¶ 8.)

After concluding the victim notification, Europe moved closer to apartment 301 and waited for backup to arrive.  (ECF No. 84 at 4 ¶ 10.)  While waiting for backup, Europe heard more shouting back and forth, including a female "yelling to get out." (ECF No. 84 at 4 ¶ 12.)  The door to apartment 301 flew open, and Kyler Grabbingbear, a six-foot tall, nineteen-year old male, emerged, carrying what looked to Europe like an end table; Europe stepped from where he waiting and commanded Grabbingbear to stop.  (ECF No. 84 at 4–5 ¶¶ 13–14, 16; ECF No. 107 at 24 ¶ 31.)  At the time of the incident, Grabbingbear had amphetamine, methamphetamine, and THC in his system. (ECF No. 84 at 6 ¶ 28.)

---

[1]  The following factual summary is based predominantly on the parties' briefs on the Motion and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.  Facts disputed by the parties are noted as such.

After Grabbingbear opened the door of the apartment, Europe states that Grabbingbear tried to push forward through him, despite Europe's telling him to stop and put the table down.  (ECF No. 84 at 6 ¶¶ 29–32.)  According to Europe, Grabbingbear intentionally and aggressively hit Europe in the legs with the table hard enough to lock Europe's knees.  (ECF No. 84 at 6–7 ¶¶ 33, 35.)  Plaintiffs dispute that Grabbingbear hit Europe with the table, pointing to evidence that there was still food on top of the table in an "organized fashion," and emphasizing that if Grabbingbear had used the table as a weapon, the food would have dropped to the floor.  (ECF No. 107 at 7 ¶ 29.)

Believing Grabbingbear was the perpetrator of a domestic violence incident, Europe pursued Grabbingbear as he attempted to flee down the stairwell.  (ECF No. 84 at 7 ¶¶ 37–43.)  Europe states that he grabbed Grabbingbear's shirt, they both lost their footing, Grabbingbear threw an elbow at Europe, and at the bottom of the stairs, they "wrestled around" while Europe attempted to gain control of Grabbingbear.  (ECF No. 84 at 7 ¶¶ 38–43.)  Europe commanded Grabbingbear to stop as they ran down the hallway and threw a flashlight at Grabbingbear.  (ECF No. 84 at 8 ¶¶ 44–45.)

Europe states that Grabbingbear tried to throw an elbow and several punches at him (ECF No. 84 at 8 ¶ 46), while Plaintiffs dispute that Grabbingbear was trying to engage in combat with Europe (ECF No. 107 at 9 ¶ 46).  Instead, Plaintiffs assert that Grabbingbear was trying to escape.  (ECF No. 107 at 9 ¶ 46.)  Europe states that he tried to get ahold of Grabbingbear, who started to get away from Europe.  (ECF No. 84 at 8 ¶ 51.)

The parties' accounts of the remainder of the encounter differ markedly.  Europe

states that Grabbingbear put him in a headlock (ECF No. 84 at 8 ¶ 53), and Europe

tried to remove Grabbingbear's hands but could not (ECF No. 84 at 8 ¶ 55).  According

to Europe, even when he managed to remove Grabbingbear's hands, Grabbingbear

immediately locked his arm around Europe's neck again.  (ECF No. 84 at 9 ¶ 56.)

Despite repeated attempts, Europe states that he could not completely break the

headlock.  (ECF No. 84 at 9 ¶¶ 57–61.)  Europe states that he began to lose

consciousness, had difficulty seeing, was unable to breathe, and became dizzy.  (ECF

No. 84 at 9 ¶¶ 62–63.)  Europe states that he finally broke free of the headlock, and with

blurry vision, could only see Grabbingbear's silhouette "coming up in his position."

(ECF No. 84 at 10–11 ¶ 71–72.)  Additionally, Europe relies on the transcribed interview

of eyewitness Michael Wilkins, who states that he heard Europe telling Grabbingbear to

stop and saw that Grabbingbear had Europe in a chokehold.  (ECF No. 89-9 at 3.)

According to Europe, as he peeled away Grabbingbear's hands, he started

drawing his service weapon, and as they stood, before Grabbingbear could again put

Europe in a headlock, Europe pushed off from Grabbingbear and fired a single shot

from his service weapon at Grabbingbear.  (ECF No. 84 at 11 ¶¶ 73–74.)  Even after

subduing Grabbingbear, Europe states that he was still struggling to breathe and felt

like he would pass out.  (ECF No. 84 at 11 ¶ 78.)  Europe states that he fired the shot

because he feared his life was in danger, and that if he did not stop Grabbingbear, he

would be "choked out" and would be dead at the end of the fight with Grabbingbear.

(ECF No. 84 at 11 ¶¶ 79–81.)

By contrast, Plaintiffs state that Grabbingbear was trying to get away from

Europe.  (ECF No. 107 at 9 ¶ 46.)  Relying on eyewitness statements of David

Sandoval, Wilkins, and Rodrigo Silva, Plaintiffs deny that Grabbingbear was attempting to strike Europe and that Grabbingbear regained a chokehold on Europe after Europe initially threw off Grabbingbear's hold.  (ECF No. 107 at 10 ¶¶ 50, 53, 55.)  By contrast, Plaintiffs state that Grabbingbear did not put Europe in a headlock after Europe released himself from Grabbingbear's grasp as the two exited the building.  (ECF No. 107 at 13 ¶ 71.)  Silva denies seeing Grabbingbear put Europe in a chokehold.  (ECF No. 89-10 at 3.)

Deputy Cory Engel arrived on the scene after Europe fired the shot at Grabbingbear.  (ECF No. 84 at 14 ¶ 98.)  When Engel initially saw Europe, Engel described Europe as disheveled, with grass stains on his uniform, with his radio hanging off him, out of breath, and looking like he had been in a pretty bad fight with someone.  (ECF No. 84 at 14 ¶ 99.)  Engel handcuffed Grabbingbear.  (ECF No. 84 at 14 ¶ 100.)  Deputy Randy Rael arrived on the scene after the shot was fired, and Europe states that Rael described Europe as out of breath, raspy, coughing a lot, with his shirt untucked, and with grass stains on his uniform.  (ECF No. 84 at 14 ¶¶ 101–05.)

Europe stated that someone should give Grabbingbear CPR.  (ECF No. 84 at 14 ¶ 106.)  A Thornton officer began CPR almost immediately, and medical personnel arrived on the scene shortly thereafter.  (ECF No. 84 at 15 ¶¶ 107–08.)  Commander John Bitterman was among the first officers to arrive on the scene after the shot was fired, and Bitterman requested paramedics to stage in the area and requested assistance from Thornton police.  (ECF No. 84 at 15 ¶¶ 109–11.)  Bitterman observed Europe breathing heavily and that he was covered in grass.  (ECF No. 84 at 15 ¶ 112.)

Grabbingbear died as a result of the gunshot wound to his chest.  (ECF No. 84 at

15 ¶ 114.)  Plaintiffs disclosed Marco Vasquez as an expert witness to opine as to the timeliness of medical aid to Grabbingbear.  (ECF No. 84 at 15 ¶ 122.)  According to Vasquez's interpretation, "Adams County Fire had been notified and been dispatched to respond to this scene at 3:44 and 21 seconds," i.e., 47 seconds after the shot was fired, and this included medical aid.  (ECF No. 84 at 16 ¶ 123.)  Vasquez's opinion is that "medical was started within a reasonable period of time."  Based on a more complete review of available data, Vasquez testified that "the time frame was well within the norm."  (ECF No. 84 at 16 ¶ 124.)  Further, Vazquez opines that CPR was started within a reasonable and appropriate time.  (ECF No. 84 at 16 ¶ 126.)

**B.    Procedural History**

On December 3, 2018, Plaintiffs filed their initial Complaint.  (ECF No. 1.)  On November 21, 2019, the Court entered an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction in which, among other things, the Court dismissed without prejudice Plaintiffs' claims against Defendant Michael McIntosh, Sheriff for Adams County.  (ECF No. 39.)

On December 11, 2019, Plaintiffs filed their Amended Complaint—which is the operative pleading—against Europe and Engel, alleging claims for excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983; assault; negligent failure to provide medical assistance; and wrongful death under Colorado Revised Statutes § 13-22-203.  (ECF No. 44.)  On December 19, 2019, Defendants filed their Answer.  (ECF No. 49.)  On June 4, 2021, Plaintiffs dismissed Engel as a defendant, leaving Europe as the only remaining defendant.  (ECF No. 81.)

On June 7, 2021, Europe filed the Motion, arguing he is entitled to summary

judgment on all claims.  (ECF No. 84.)  On December 15, 2021, Plaintiffs filed their

amended response in opposition.  (ECF No. 107.)  On July 12, 2021, Europe filed his

reply.  (ECF No. 91.)

### III. ANALYSIS

**A.    Qualified Immunity on Excessive Force Claim**

    1.    Legal Standards

        a.    *Excessive Force*

"[A]ll claims that law enforcement officers have used excessive force—deadly or

not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard

. . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed).  Under this

standard, "the question is whether the officers' actions are objectively reasonable in light

of the facts and circumstances confronting them, without regard to their underlying

intent or motivation."  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

Applying this standard "requires careful attention to the facts and circumstances

of each particular case, including [1] the severity of the crime at issue, [2] whether the

suspect poses an immediate threat to the safety of the officers or others, and

[3] whether he is actively resisting arrest or attempting to evade arrest by flight."

*Graham*, 490 U.S. at 396; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th

Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant

to [an] excessive force inquiry").  The Court may further consider whether "the officers'

own reckless or deliberate conduct during the seizure unreasonably created the need to

use such force."  *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (internal

quotation marks and citation omitted).

    b. *Qualified Immunity*

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the qualified immunity defense is raised, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time.  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  *Id.* (internal quotation marks omitted).  Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts.  The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.  The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

2.   <u>Constitutional Violation</u>

Arguing that he is entitled to qualified immunity on Plaintiffs' excessive force claim, Europe asserts that his "uses of force were well within the bounds of reasonableness proscribed by *Graham*." (ECF No. 84 at 20.) Whether Europe's application of force in firing a single shot that ultimately killed Grabbingbear was excessive, however, is here a central issue of material fact. *Cf. Estrada v. Smart*, 514 F. Supp. 3d 1270, 1278 (D. Colo. 2021) (denying motion to dismiss and finding no qualified immunity where plaintiff fled while his hands and feet were bound with shackles and defendant shot him four times).

With respect to the first *Graham* factor, the parties dispute the severity of the crime at issue. Europe states that Grabbingbear was suspected of being involved in domestic violence, as well as second-degree assault on a peace officer following Grabbingbear allegedly hitting Europe in the knees with the end table. (ECF No. 84 at 7 ¶¶ 14, 36–37, at 20–21.) By contrast, Plaintiffs dispute that Grabbingbear used the table as a weapon against Europe, arguing that if he had, the food on the table would have fallen to the floor when Grabbingbear allegedly struck Europe with the table. (ECF No. 107 at 7 ¶ 29, at 29.) Thus, a factual dispute exists not only as to the severity of the crimes at issue, but also as to what crimes are at issue in the first place.

With respect to the second and third[2] *Graham* factors, which the Court considers together here, a reasonable jury could accept Plaintiffs' version of the circumstances of the encounter between Grabbingbear and Europe, and therefore disbelieve Europe's

---

[2] The third *Graham* factor considers whether the plaintiff is actively resisting arrest or attempting to evade arrest by flight. It is unclear from the briefs whether Europe was attempting to arrest Grabbingbear or merely speak with him, but it seems undisputed that Grabbingbear was attempting to evade Europe.

testimony to the contrary.  Specifically, accepting Plaintiffs' version of the facts, a reasonable jury could find that based on Sandoval's affidavit, in which he states that "right before the shot the boy was trying to get away" and "I saw the cop punch the boy in the head at least 10 times" (ECF No. 89-13), that Europe's action in firing a single shot at Grabbingbear was not objectively reasonable and violated Grabbingbear's Fourth Amendment right against excessive force.[3]  Further, it is plausible that Wilkins's statement that "the kid was trying to run while . . . trying to . . . get the cop off him" (ECF No. 89-9 at 3), and Silva's statement that the "suspect was trying to break free" (ECF No. 89-10), also support Plaintiffs' argument that Grabbingbear was attempting to "get away rather than subdue Europe" (ECF No. 107 at 31).

Based on these hotly disputed facts, the Court concludes that there is a genuine dispute of material fact as to whether Europe's actions were objectively reasonable in light of the facts and circumstances confronting him.  Therefore, a question remains as to whether Europe violated Grabbingbear's constitutional rights.

### 3.  Clearly Established Law

Europe contends that he is unaware of a case from the Tenth Circuit or the Supreme Court that clearly establishes that it is "unlawful for a law enforcement officer to use deadly force in response to being repeatedly choked in a headlock—to the point of struggling to regain consciousness—with no backup present."  (ECF No. 84 at 27.)

In response, Plaintiffs argue that "the actions complained of do not have to mirror with exactitude a prior case.  Rather the actions complained of must violate concepts

---

[3] To the extent Europe relies on *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) to argue that the Court should find that the Sandoval affidavit cannot raise a genuine issue of material fact (ECF No. 84 at 24–26), the Court finds this argument without merit.  *Anderson* is an out-of-circuit case and does not constitute binding authority.

set forth in established law."  (ECF No. 107 at 32.)  For support, Plaintiffs cite

*Tennessee v. Garner*, 471 U.S. 1, 105 (1985), though Plaintiffs' reliance on *Garner* is

conclusory and underdeveloped.  (*Id.*)  The extent of Plaintiffs' anemic argument is that

*Garner* is "instructive."  (*Id.*)

      In his reply, Europe emphasizes that to rely on *Garner* is to violate the Supreme

Court's instruction "not to define clearly established law at a high level of generality."

(ECF No. 91 at 19 (quoting *Ashcroft*, 563 U.S. at 742).)

      The Court is decidedly unimpressed by Plaintiffs' lackadaisical effort to develop

their argument regarding the second prong of qualified immunity.  Nonetheless, the

Court must agree with their general position.  *Garner* "addressed a Tennessee statute

permitting an officer to 'use all the necessary means to effect the arrest' of a fleeing

suspect."  *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 993 (10th Cir. 2020).  As

Justice John Paul Stevens emphasizes in his dissent in *Scott v. Harris*, "[a]lthough

*Garner* may not . . . 'establish a magical on/off switch that triggers rigid preconditions'

for the use of deadly force . . . it did set a threshold under which the use of deadly force

would be considered constitutionally unreasonable[.]"  550 U.S. 372, 394–95 (2007)

(Stevens, J., dissenting) (citation omitted).  The Tenth Circuit recently addressed

*Garner* in the context of qualified immunity, finding that

> *Garner* clearly established that when a "suspect poses no
> immediate threat to the officer and no threat to others, the
> harm resulting from failing to apprehend him does not justify
> the use of deadly force to do so."  . . .  In other words, it is
> clearly established that an officer cannot use deadly force
> once a threat has abated. . . .

*Reavis*, 967 F.3d at 993 (internal citations omitted).  "Whether a person's actions have

risen to a level warranting deadly force is a question of fact best reserved for a jury."

*Scott*, 550 U.S. at 395.

The Court acknowledges Europe's argument that *Garner* does not address the same type of factual situation at issue in the instant case.  (ECF No. 91 at 18–19.) Despite Europe's argument, "[t]he Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, 'clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances.'"  *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 854 (D.N.M. 2020) (quoting *A.N. by & through Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019)).  The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law."  *Id.* (quoting *A.N. by & through Ponder*, 928 F.3d at 1198).  According to the Tenth Circuit, "[i]n other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'  And this is so 'even though the very action in question has not previously been held unlawful.'"  *Id.* (quoting *A.N. by & through Ponder*, 928 F.3d at 1198).

Here, viewing the evidence in the light most favorable to Plaintiffs, a jury could reasonably find, based on the eyewitnesses' statements, that Grabbingbear was trying to get away from Europe when he was shot.  It is true that Europe and Plaintiffs vehemently dispute whether Grabbingbear posed an immediate threat to Europe's life after Europe broke the chokehold.  On one hand, Plaintiffs argue Grabbingbear was trying to run from Europe.  By contrast, Europe contends that after he freed himself from

Grabbingbear's chokehold, he was on the verge of losing consciousness and feared Grabbingbear would regain his chokehold and thus endanger Europe's life.  Europe states that he believed that if he did not stop Grabbingbear, he would die.  (ECF No. 84 at 11 ¶ 79.)

Given these circumstances, the Court finds there are genuine disputes of material fact that preclude any finding, at this phase, that the law was *not* clearly established.  *See Fisher v. City of Las Cruces*, 584 F.3d 888, 895–902 (10th Cir. 2009) (qualified immunity unavailable at summary judgment where the plaintiff's version of the facts, if believed, would constitute a violation of a clearly established right).  Under at least one view of the facts that a reasonable jury could adopt, Europe violated a clearly established right.  There may be other interpretations that a jury could accept, some of which might entitle Europe to qualified immunity and others which would not.  The Court's task at this summary judgment phase is to determine whether there is any genuine dispute of the material facts, the resolution of which would deprive Europe of the defense of qualified immunity.  Here, such a set of facts exists, precluding the Court from ruling as a matter of law prior to trial that Europe is immune from suit.  Summary judgment on qualified immunity grounds is therefore inappropriate.

**B.     State Law Claims**

Plaintiffs have also brought state law claims for assault, negligent failure to provide medical assistance, and wrongful death.  (ECF No. 44.)

1.     <u>Legal Standards</u>

Under the Colorado Governmental Immunity Act ("CGIA"),

> [a] public employee shall be immune from liability in any
> claim for injury, whether brought pursuant to this article,
> section 29-5-111, C.R.S., the common law, or otherwise,

> which lies in tort or could lie in tort regardless of whether that
> may be the type of action or the form of relief chosen by a
> claimant and which arises out of an  act or omission of such
> employee occurring during the performance of his duties and
> within the scope of his employment unless the act or
> omission causing such injury was willful and wanton . . . .

Colo. Rev. Stat. § 24-10-118(2)(a).  "[T]o be willful and wanton, public employees must be consciously aware that their acts or omissions create a danger or risk to the safety of others, and they then act, or fail to act, without regard to the danger or risk." *A.B., by Ybarra v. City of Woodland Park*, 174 F. Supp. 3d 1238, 1248 (D. Colo. 2016) (quoting *Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012)).  It is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (citing Colo. Rev. Stat. § 13-21-102(1)(b), the exemplary damages statute, and other sources in evaluating whether conduct was willful and wanton under the CGIA). Although whether a defendant's actions are willful and wanton is generally a question of fact, *U.S. Fire Ins. Co. v. Sonitrol Mgmt. Corp.*, 192 P.3d 543, 549 (Colo. App. 2008), if the record is devoid of sufficient evidence to raise a factual issue, the question may be resolved as a matter of law, *Forman v. Brown*, 944 P.2d 559, 564 (Colo. App. 1996).

To prevail on their assault claim, Plaintiffs must prove: (1) the defendant acted either with the intent of making a contact with the person of the plaintiff or with the intent of putting the plaintiff in apprehension of such a contact; (2) the plaintiff was placed in apprehension of an imminent contact with his or her person by the conduct of the defendant; and (3) such contact was or appeared to be harmful or offensive.  *Adams v. Corr. Corp. of Am.*, 187 P.3d 1190, 1198 (Colo. App. 2008).

Second, because Plaintiffs' claim for negligent failure to provide medical assistance is founded on negligence, Plaintiffs bear the burden of proving:

> (1) a duty or obligation, recognized by law, requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure or breach of duty by the defendant to conform to the standard required by law; (3) a sufficient causal connection between the offensive conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of the plaintiff.

*Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 242 (Colo. 1987).

Finally, the cause of action for wrongful death is created by statute. *Mangus v. Miller*, 535 P.2d 219, 221 (Colo. App. 1975). The wrongful death statute provides:

> When the death of a person is caused by a wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then . . . . the person who . . . .would have been liable, if death had not ensued, shall be liable in an action for damages notwithstanding the death of the party injured.

Colo. Rev. Stat. § 13-21-202. Parties only have standing to sue for wrongful death in the manner provided in § 13-21-201. Colo. Rev. Stat. § 13-21-203(1)(a). The breach of duty to be established under the statute is that owed by the tortfeasor to the deceased, not that owed to the heirs of the deceased. *Espinoza v. O'Dell*, 633 P.2d 455, 463 (Colo. 1981).

2.   <u>Analysis</u>

a.   *Assault and Wrongful Death*

In the Motion, Europe argues that Plaintiffs have failed to demonstrate that Europe's conduct was willful and wanton, and therefore, their assault and wrongful death claims are barred by the CGIA. (ECF No. 84 at 28.)  Notwithstanding Plaintiffs'

purported failure to demonstrate that Europe exhibited willful and wanton conduct, Europe argues that an absence of evidence supports Plaintiffs' state law claims for assault and wrongful death.  (*Id.* at 32–25.)  Therefore, Europe argues that he is entitled to summary judgment with respect to both of these state law claims.

In response, Plaintiffs again rely on the statements of Wilkins, Silva, and Sandoval to show that Europe escaped Grabbingbear's hold as the two men exited the building.  (ECF No. 107 at 37.)  They argue that the autopsy report (ECF No. 89-14), photographs of Grabbingbear's body reflecting numerous injuries (ECF No. 89-7), and Dr. Michael Arnall's testimony regarding the path of the bullet (ECF No. 89-16) "indicate that Europe was the successful aggressor rather than the victim of an assault."  (ECF No. 107 at 37.)  Aside from setting forth the legal standard for the definition of "willful and wanton," Plaintiffs cite no case law supporting their argument that this evidence demonstrates that Europe's conduct was willful and wanton.  (*Id.* at 36–39.)

Despite the deficiencies in Plaintiffs' brief, the Court must construe the evidence in the light most favorable to Plaintiffs, the non-moving parties.  Having done so, the Court finds that there is sufficient evidence to create a factual issue of whether Europe fired a shot at Grabbingbear when he was trying to flee, rather than when he was allegedly attempting to kill Europe.  "The Court is mindful that since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *A.B., by Ybarra*, 174 F. Supp. 3d at 1249 (quoting *Pauly v. White*, 814 F.3d 1060, 1079 (10th Cir. 2016) (internal quotation marks omitted)).  Instead, the Court must consider the circumstantial and

other evidence relevant to the matter.  *See id.*  After considering the evidence

presented, there exists genuine issues of material fact for a jury to decide whether

Europe's conduct was purposeful, and committed recklessly with conscious disregard

for the rights and safety of Grabbingbear.

Having addressed Europe's arguments concerning the CGIA, the Court next

analyzes his arguments regarding the merits of the assault and wrongful death claims.

In his reply, Europe argues that

> [e]ven assuming for the sake of argument that the CGIA
> does not shield Deputy Europe from liability on the state law
> claims, Plaintiffs have failed to establish facts necessary to
> prevail on those claims.  Plaintiffs fail to respond to Europe's
> arguments as to the elements of assault, negligent failure to
> provide medical assistance, and wrongful death.  Summary
> judgment for Europe as to the state law claims is appropriate
> for all the reasons discussed in Europe's Motion.

(ECF No. 91 at 20.)

The Court agrees that Plaintiffs have utterly failed to respond to Europe's

argument that they have not established facts necessary to prevail on their claims for

assault and wrongful death.  (*See* ECF No. 107.)  Counsel's response is deficient and

quite unhelpful to the Court.  However, despite these glaring deficiencies, the Court

cannot ignore the fact that the central facts which overlay Plaintiffs' claim for excessive

force *also* form the factual basis for their assault and wrongful death claims.  It would be

utterly inconsistent for the Court to find that a genuine issue of material fact exists as to

Plaintiffs' excessive force claim one the one hand, and on the other find that the same

factual basis fails to create a genuine issue of material fact in connection with their

assault and wrongful death claims.

Accordingly, summary judgment based on Plaintiffs' claims for assault and

wrongful death is denied.

> b.    *Negligent Failure to Provide Medical Assistance*[4]

In the Motion, Europe argues that Plaintiffs have failed to demonstrate that his conduct in connection with their negligent failure to provide medical assistance claim was willful and wanton.  (ECF No. 84 at 33–34.)  And even assuming Plaintiffs have met their burden under the CGIA, Europe argues that by failing to respond to his argument that Plaintiffs failed to establish facts necessary to prevail on the claim, they cannot prevail on this claim.  (ECF No. 91 at 20.)

In their response, Plaintiffs raise an argument concerning Europe's purportedly willful and wanton conduct.  (ECF No. 107 at 36–39.)  However, as Europe highlights, Plaintiffs failed to respond to Europe's arguments that they have failed to meet their burden to demonstrate that a genuine issue of material fact exists as to their claims for negligent failure to provide medical assistance.  (*See id*.)

The Tenth Circuit teaches that "the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment."  *Pinkerton v. Colo. Dep't of*

---

[4] Inexplicably, in their response, Plaintiffs state that "[d]isputed factual issues preclude the conclusion that Europe did not commit a constitutional violation when he failed to provide Grabbingbear with medical assistance."  (ECF No. 107 at 34.)  Plaintiffs proceed to argue why Europe violated the due process clause of the Fourteenth Amendment with respect to his purported failure to provide medical assistance.  (*Id*. at 34–36.)  However, as Europe correctly points out in his reply, there is no Fourteenth Amendment claim for failure to provide medical assistance; Plaintiffs did not bring a constitutional claim related to medical assistance against Europe.  (ECF No. 91 at 19.)

The Court will not speculate as to why Plaintiffs' counsel raised arguments in the response in connection with a claim Plaintiffs have not brought.  Regardless, "[d]ue to these failures, this [C]ourt cannot even attempt to assess the merits of [Plaintiffs'] argument."  *United States v. McClatchey*, 217 F.3d 823, 835-36 (10th Cir. 2000).  Moreover, the Court cannot and will not make Plaintiffs' arguments for them and apply their arguments on this unalleged claim to their negligent failure to provide medical assistance claim.  *See Meyer v. Bd. of Cnty. Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007) ("[W]e are not charged with making the parties' arguments for them.").

*Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198 n.6 (10th Cir. 2008) (stating that, "[t]o avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial" and that "mere conjecture" is insufficient)).  On a motion for summary judgment, "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record."  *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)); *see also Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him.").  "A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."  *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999).

Based on the deficient presentation by Plaintiffs' counsel in response to the Motion, the Court finds that Plaintiffs have failed to meet their burden of presenting specific facts, by reference to specific evidence in the record, to overcome the motion for summary judgment with respect to their claim for negligent failure to provide medical assistance.[5]  *See Mitchell*, 218 F.3d at 1199.  Therefore, Europe is entitled to summary

---

[5] The Tenth Circuit has found that the district court is not required to give a party the chance to correct inadequacies in a brief.  *See Mitchell*, 218 F.3d at 1199 ("No matter how often they are made to feel the part, our brothers and sisters on the district court bench should not be cast in the role of stage director of the litigation drama—forced to prod the actors through rehearsals until the proper performance is achieved.  To do so would not only consume an inordinate amount of time, but would result in courts abandoning their neutrality and becoming advocates in the adversarial process.  We will not sanction such a transformation.").  Additionally, the district court is not required to go beyond the referenced portions of the materials because if it were otherwise, "the workload of the district courts would be insurmountable and summary judgment would rarely be granted."  *Id.* (quotation marks omitted).

judgment on Plaintiffs' claim for negligent failure to provide medical assistance.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS:

1.  Defendant Wilfred Europe's Motion for Summary Judgment (ECF No. 84) is GRANTED IN PART and DENIED IN PART as follows:

    a.  The Motion for Summary Judgment is DENIED as to Plaintiffs' claims for excessive force, assault, and wrongful death;

    b.  The Motion for Summary Judgment is GRANTED as to Plaintiffs' claim for negligent failure to provide medical assistance;

    c.  At the conclusion of this action, Europe will be entitled to judgment on Plaintiffs' claim for negligent failure to provide medical assistance; and

2.  This case REMAINS SET for a Final Trial Preparation Conference on **November 10, 2022 at 2:00 p.m.** and a five-day jury trial beginning on **November 28, 2022 at 8:30 a.m.**

Dated this 18th day of January, 2022.

BY THE COURT:

William J. Martinez
United States District Judge